No. 4566.

CORNELIA HART, Tutrix v. HOSS & ELDER, Administrators.   T. E. HART v. the same.   (Consolidated.)

Under the first-section of the civil rights act, the sixth article of the Constitution of the United States, and the State Constitution of 1864, title 1, art. 1, Cornelia Hart, a colored person, was vested in November, 1867, with the right to enter into a contract of marriage, and her marriage at that epoch with C. E Hart, a white man, was clothed with all the formalities required by law—which marriage, if there existed any doubt as to its validity, would have to be considered as ratified and confirmed by art. 149 of the State Constitution of 1868.

In 1867, when the marriage of Cornelia Hart was effected, the incapacity attaching to her children under former laws, of being legitimated on the ground of the legal inability of their parents to contract marriage at the time of the conception of the children, had been obliterated.

It is considered well settled that other modes of the acknowledgment of illegitimate children, besides that by notarial act, are authorized by the laws of this State. Any alteration made in the Code of 1870 as to this matter, could not affect the rights of the children of Hart, which were fixed in 1867.

The fact that C. E. Hart, now deceased, had acknowledged as his children the issue of his cohabitation with Cornelia, is sufficiently established to enable this court to decide that they were capable of inheriting from their father at the time of his decease in 1869.

APPEAL from the Parish Court of the parish of Caddo. *Smith*, J. *Land & Taylor*, for plaintiff and appellee. *Egan, Williamson & Wise*, for T. E. Hart et al., and for administrator Nathan Hoss, appellants.

TALIAFERRO, J.  Two sets of litigants, claiming adversely to each other a large succession opened in the parish of Caddo in 1869, brought these suits against the two administrators of the estate, claiming it as heirs and praying to be put into possession of the property of the estate.  One of the suits is brought in behalf of her children by Cornelia Hart, alleging that she is the widow of E. C. Hart, deceased, and natural tutrix of her minor children, issue of her marriage with the said Hart, and that they are the legal heirs of their father.  The other suit was instituted by various persons, setting themselves up as the

nearest relatives of E. C. Hart and entitled to his estate as collateral heirs. The administrators answered separately. One of them, Elder, answered by general denial. Hoss, the other administrator, specially denies the rights claimed by the tutrix for her minor children, and avers specially that the plaintiff being a woman of color, she was prohibited by law from marrying E. C. Hart, and that her children could not be legitimated by a marriage subsequent to their conception and birth. He further averred that one Theodore Hart and others claimed to be the heirs of E. C. Hart, deceased. The two suits were consolidated and tried together in the parish court. Judgment was rendered in favor of the tutrix, recognizing her as the lawful wife of E. C. Hart, deceased, and the children represented by her as the legitimate children and heirs of E. C. Hart, ordering that the tutrix be put into possession of the property of his estate, and rejecting the pretensions of Theodore Hart et al. From this judgment Hoss, one of the administrators, and Theodore Hart and his co-plaintiff, have appealed.

There is an exception by the administrator Elder to the jurisdiction of the court quoad the suit of Theodore Hart et al. on the ground that the plaintiffs in that case are claiming adversely to Cornelia Hart, tutrix, a succession worth more than five hundred dollars. In each suit the plaintiffs are claiming to be heirs of E. C. Hart, deceased, and pray to be recognized as such and to be put into possession of his estate. Their claims are adverse to each other.' But neither is suing the other for the succession. The issue before the court is, which of the parties plaintiffs, if either, are the heirs of E.' C. Hart. The leading question is, which of these parties, if either, shall be recognized as the heirs of the decedent. The parish court clearly has jurisdiction. Code of Practice, articles 1000 and 1003.

The material facts elicited by this litigation are, that E. C. Hart, whose succession forms the bone of contention, lived a number of years in concubinage with the plaintiff Cornelia, a woman of color. Several children, all minors at the time of Hart's death in 1869, were the fruit of this intercourse. In November, 1867, Hart and Cornelia were married in Shreveport, about eighteen months before the decease of Hart. This marriage was solemnized by a Roman Catholic priest in accordance with the forms of the Roman Catholic Church. A regular proces verbal of the ceremony of marriage was made out and signed by the parties to the marriage, by three witnesses and by the priest who officiated. No marriage license was issued, and no return was made of the act of celebration for record.

Subsequently the children were baptized by the same priest, of which he furnished a certificate. At the baptism the father was not present, but it is shown that it was done at his instance and by his consent

Cornelia Hart, Tutrix, v. Hoss & Elder, Administrators.   T. E. Hart v. the same.

The plaintiff Cornelia, was confirmed natural tutrix of her minor children, representing them to be the legal heirs of E. C. Hart, deceased. Letters of tutorship were issued to her and an under tutor appointed.

The ground assumed in this controversy by Theodore Hart and others claiming as the collateral heirs is, that at the date of the alleged marriage between E. C. Hart and Cornelia the plaintiff, marriage between a white person and a person of color was prohibited by the laws of Louisiana, and that the pretended marriage of those persons. was null as having been entered into in violation of a prohibitory law. They urge that the marriage was a " private marriage" in the sense of the statute of 1868, No. 210, pages 278 and 279; that proof of that class of marriages can only be made by notarial act executed by the parties. in conformity with the provisions of that act. They further contend that aside from the question of color, the illegitimacy of the children, arising from their having been born out of wedlock operates an incapacity to inherit which can only be removed by legitimation in the manner prescribed by law, and refer to Civil Code, articles 180, 198 and 200. They assumed from these articles and from the statute of 1870, entitled " An act to authorize natural parents to legitimate their natural children (acts of 1870, p. 96) that legitimation of the children of E. C. Hart could be made only by the formal acknowledgment by the father in an act passed before a notary and two witnesses. They aver that such proof has not been made in this case and they stand upon the inadmissibility of any other species of proof to establish their legitimacy, referring to articles 198 and 200 of the Civil Code.

On the other side it is argued that at the date of the marriage of E. C. Hart to Cornelia there was no law of Louisiana prohibiting the marriage; that the children of that marriage may and have availed themselves of the existing laws of the State to establish their legitimacy and their right to inherit their father's estate. Civil Code, articles 208 and 209. It is contended in their behalf that if, at any time prior to the marriage of their parents, there existed an incapacity in them to occupy the status of legal heirs, that incapacity was removed by the passage by the Congress of the United States, of the act of April 9, 1866, commonly known as the " Civil Rights Bill," and by the adoption of the fourteenth amendment to the Constitution of the United States. The plaintiffs in suit 653, object that the Civil Rights Bill is unconstitutional and that the fourteenth amendment was adopted after the marriage took place between E. C. Hart and Cornelia. the mother of the children.

The first section of the Civil Rights Act declares "that all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the

United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation or custom to the contrary notwithstanding."

The subsequent sections provide the means for enforcing the law in the several States and Territories, and denounces certain penalties for violating its provisions, and provides for final appeal to the Supreme Court of the United States.

This act of Congress only declares who shall be citizens of the United States, what shall be their rights and privileges in the several States, and provides penalties for a violation of those rights and privileges. This we think Congress had clearly the right to do, and we therefore see no reason to doubt the constitutionality of the act.

The sixth article of the constitution of the United States declares that " this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding."

If this law of Congress called the " Civil Rights Act" is not in violation of the constitution of the United States, it is paramount to any State law, and the provisions of any State law that are inconsistent with or conflict with it are to that extent annulled.

If Cornelia Hart and her children were once slaves, they became free persons under the State constitution of 1864, title 1, article 1:

"Slavery and involuntary servitude, except as a punishment for crime, whereof the party shall' have been duly convicted, are hereby forever abolished and prohibited throughout the State."

The constitution of 1864 made the appellee and her children free persons. The act of Congress of April, 1866, made them citizens of the United States, and relieved them of all previous disabilities they labored under on account of race, color or previous condition of slavery, by annulling previously existing laws of the State creating such disabilities, and conferred upon and vested in them all the civil rights and privileges of white persons. Cornelia Hart, therefore, in

94 . SUPREME COURT OF LOUISIANA,

Cornelia Hart, Tutrix, v. Hoss & Elder, Administrators.  T. E. Hart v. the same.

November, 1867, was vested with the right to enter into a contract of marriage.  Our law considers marriage in no other view than as a civil contract.  C. C. art. 86.

Article 90 of the Code proceeds: "As the law considers marriage in no other view than that of a civil contract, it sanctions all those marriages where the parties at the time of making them were, first, willing to contract; second, able to contract; third, did contract pursuant to the forms and solemnities presented by law."

All the conditions required by the laws of Louisiana to constitute a valid marriage we think were fulfilled in the marriage of E. C. Hart with Cornelia, the mother of his children.  It is distinctly established by the testimony of the priest who performed the marriage ceremony that the marriage was not what is termed "a private marriage," as contended for by the appellants, such marriages not being permitted by the rules of the Catholic church.  The objections to the validity of this marriage because no marriage license was issued, and that it was not published or made public, we consider as without weight.  Article 149 of the present State constitution declares:

"All rights, actions, prosecutions, claims, contracts, and all laws in force at the time of the adoption of this constitution and not inconsistent therewith, shall continue as if it had not been adopted.  All judgments and judicial sales, marriages and executed contracts, made in good faith and in accordance with existing laws in this State, rendered, made or entered into between the twenty-sixth day of January 1861, and the date when this constitution shall be adopted, are hereby declared to be valid, except the following laws," etc.

The marriage of these parties having been entered into within the period embraced by this article of the constitution of 1868, and having been celebrated in accordance with existing laws of this State, seems to have been ratified and confirmed, had there existed any doubt of its validity.

On the question of the legitimation of the children the appellants rely upon the articles 198 and 200 of the Civil Code.  Article 198 provides that, "children born out of marriage, except those who are born from an incestuous or adulterous connection may be legitimated by the subsequent marriage of their father and mother whenever the latter have legally acknowledged them for their children either before their marriage by an act passed before a notary and two witnesses, or by their contract of marriage itself."  Article 200 declares that "a natural father or mother shall have the power to legitimate his or her natural children by an act passed before a notary and two witnesses, declaring that it is the intention of the parent making the declaration to legitimate such child or children.  But only those natural children

can be legitimated who are the offspring of parents who, at the time of conception, could have contracted marriage. Nor can a parent legitimate his or her natural offspring in the manner prescribed in this article when there exists on the part of such parent legitimate ascendants or descendants."

By the former laws of this State the children of E. C. Hart by the colored woman Cornelia could not have been legitimated for the reason that at the time of their conception, their parents could not have entered into marriage; but in the consideration of the subject we must bear in mind that at the time of the marriage of these parents in 1867, the incapacity in the children under the former laws of becoming legitimated on the ground of the legal inability of their parents to contract marriage at the time of the conception of the children, had been obliterated. No incapacity for that cause existed. The effect of the law of Congress was, to place them in the situation they would have been in under the former laws, if at the time of their conception their parents could have contracted marriage; in other words the effect of the law of Congress was to place them in every respect as to legal rights, in the situation of white children; and in this investigation we must throughout consider them as occupying the same position that white children occupy.

But we understand the appellants to hold that without regard to color children in this category can only be legitimated by the marriage of their parents and the acknowledgment of the parents made by an act passed before a notary and two witnesses. In this we apprehend they are in error. Other modes of acknowledgment seem clearly to be authorized by our laws. " The filiation of legitimate children may be proved by a transcript from the birth or baptism kept agreeably to law or the usages of the country." C. C. article 193.

An acknowledgment may be made by the contract of marriage. C. C. 198.

"Illegitimate children who have not been legally acknowledged may be allowed to prove their paternal descent. C. C. article 208.

The succeeding article of the Code declares: " In the case where the proof of paternal descent is authorized by the preceding article, the proof may be made in either of the following ways:

*First*—By all kinds of private writings in which the father may have acknowledged the bastard as his child, or may have called him so.

*Second*—When the father, either in public or private, has acknowledged him as his child, or has called him so in conversation, or has caused him to be educated as such.

*Third*—When the mother of the child was known as living in a state

of concubinage with the father, and resided as such in his house at the time the child was conceived."

We consider it well settled that other modes of the acknowledgment of illegitimate children besides that by notarial act are authorized by the laws of this State. In the case of Lange et al. v. Richoux et al., 6 L. R. 570, this court said, in reference to this subject, that "the words used in article 221 [203 of Ray's Code] are not prohibitive, and so far from declaring that a declaration before a notary shall be the only proof permitted, the Code expressly permits other modes of proof, both of paternal and maternal descent, without any restriction as to the purpose for which it may be allowed." The cases referred to by the counsel for appellants seem to relate to colored children under laws not now in force, and are not applicable to the case before us.

It remains to be considered whether the children of Cornelia Hart were capable of inheriting at the time of the opening of the succession of E. C. Hart in May, 1869. Article 950 of the Civil Code declares that it is "at the moment of the opening of the succession that the capacity or incapacity of the heir who presents himself to claim an intestate succession is considered." Article 945 provides that "all persons, even minors, lunatics, persons of insane mind, and the like, may transmit their estates ab inestato and inherit from others." Article 199 declares that "children legitimated by a subsequent marriage have the same rights as if they were born during marriage." Article 954 declares that "the child legitimated by a marriage posterior to its conception, only takes those successions which are opened since the marriage of the father and mother."

The marriage of E. C. Hart with Cornelia, the mother of the children, claiming for them the succession of their father, was a valid marriage. The record abounds with evidence of the recognition and acknowledgment of these children by E. C. Hart. His solicitude to transmit his property to them is shown to have been strong. The Catholic priest testifies that prior to his marriage with Cornelia, Hart desired him to take a conveyance of all his property in trust for his children. His avowed object in marrying their mother was to legitimate them. They were baptized in the church as the children of E. C. Hart and Cornelia Hart. The act was performed with his knowledge and at his instance. He requested a friend to be present and stand as godfather to them. A registry of the baptism was made in due form. He called the children his own, caused them to be educated as such, and as his children employed physicians to attend them in sickness. Upon the cross-examination of Cornelia, the mother, she testified that E. C. Hart, in 1857, made a will in which he acknowledged as his own her two children then born, and provided for them and herself, and that he

Cornelia Hart, Tutrix, v. Hoss & Elder, Administrators.   T. E. Hart v. the same.

destroyed the will after their marriage. The evidence fully establishes that the mother was well known as living in a state of concubinage with the father, and resided in his house at the time the children were conceived and born. No impediment would be in the way of white children becoming legitimated, standing in every respect under the same circumstances.

We conclude upon the whole, that the children of E. C. Hart were capable of inheriting from their father at the time of his decease; that they are his legal heirs, and entitled by law to his succession.

There are various bills of exceptions in the record, taken by the appellants, to the admission of evidence offered by the counsel for the tutrix, to establish the acknowledgment of her children by Hart. The testimony we think was admissible under the pleadings, and that the exceptions were not well taken.

It is therefore ordered, adjudged and decreed, that the judgment of the parish court be affirmed with costs.

---

## ON REHEARING.

LUDELING, C. J. We deem it unnecessary to pass upon the questions raised by the amended pleadings and by the bills of exceptions, inasmuch as we propose to decide the questions raised by said amended answers; and the facts necessary to present those issues are either proved or admitted to be true. The ends of justice will be subserved, therefore, by a termination of this protracted and fierce litigation.

The pleadings and facts of this case are substantially stated in the opinion of the court rendered on the tenth of February, 1873.

The important questions to be determined are:

*First*—What effect did the Civil Rights bill have upon the status of Cornelia Hart and her children, persons of color?

*Second*—Did the law of Louisiana in 1867 exclude or prohibit all other modes of acknowledgments for the purpose of the legitimation of children by a subsequent marriage except those made in notarial acts, in the registry of birth or baptism, or in the act of marriage?

*Third*—Did E. C. Hart and Cornelia Hart legally acknowledge their children before their marriage?

I. The effect of the Civil Rights bill was to strike with nullity all State laws discriminating against them on account of race or color, and to confer upon them the rights and privileges which they would have under the State laws if they were white persons. It invested her with the capacity to enter into the contract of marriage with E. C. Hart, a white man, and to legitimate her children by him born before said marriage, just as if she had been a white woman.

7

The law declares they "shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation or custom, to the contrary notwithstanding." Marriage is a civil contract.   C. C. art. 91.

II. The Code of 1825, under which the rights of the parties must be determined, subject, of course, to the modifications made therein by the civil rights bill, passed in April, 1866, contains the following provisions: "Children born out of marriage, except those who are born from an incestuous or adulterous connection, may be legitimated by the subsequent marriage of their father and mother, whenever the latter have legally acknowledged them for their children, either before their marriage or by their marriage contract itself."

It is contended that the natural children could not be legally acknowledged, except by a formal act, a solemn act, in which form is of the essence. We have searched the Code in vain to find anything to support this position when white children are concerned. The only article of the Civil Code relied upon is article 221. It provides that "the acknowledgment of an illegitimate child shall be made by a declaration, executed before a notary public, in presence of two witnesses, whenever it shall not have been made in the registering of the birth or baptism of such child. No other proof of acknowledgment shall be admitted in favor of children of color."

To say that this article is not prohibitive of other proofs of acknowledgment, except in favor of children of color, would be but a repetition of the language of the article. To maintain that the prohibition applied to white children, would be to render useless or meaningless an entire sentence in the article.

A statute is to be so construed as to give sense and meaning to every part, if possible. The maxims, "*expressio unius est exclusio alterius*," and "the exception proves the rule," are fully applicable to this article. Therefore, "other proof of acknowledgment shall be admitted in favor of" white children. And article 227 of the Code of 1825 declares some of the ways in which proof of acknowledgment may be made when not prohibited. It may not be amiss here to notice that in the Code of 1808, the article 25 of sec. 2, chap. iii, corresponding to article 221 of the Code of 1825, made no distinction between white and colored children as to the kind of proof required, while the Code of 1825, as we have already seen, made a marked distinction. And

the Code of 1870, while obliterating all distinctions on account of race
or color, made a material addition in article 119 (217) by incorporating
in said article the words, "by an act passed before a notary and two·
witnesses," after the clause, "whenever the latter shall have legally
acknowledged them," etc. But, of course, this change can not affect
the rights of the children of Hart, which were fixed in 1867. C. C.
art. 944.

The question presented in this case, it is believed, has never been
directly adjudicated by this court. The case reported in 4 Mart. 266,
was under the Code of 1808, and the parties to it were colored per-
sons; and so they were in the following cases, in which the court
expressed opinions in regard to the manner of proving an ackowledg-
ment, to wit: 4 La. 175; 6 La. 560; 14 La. 542; 12 R. 57; 6 An. 157;
15 An. 342, and 21 An. 435. The views therein expressed are some-
what conflicting, and the cases preceding that in 6 An., Dupré v. Ca-
ruthers, were reviewed by Mr. Justice Preston, in whose conclusions
alone a majority of the court concurred, while Mr. Justice Rost, dis-
senting, reviewed the law and the decisions of this court, as well as
the jurisprudence of France upon the subject. He adhered to the
opinions expressed in Lange et al. v. Richoux et al., 6 La. 570, in which
it was held that the language used in article 221 C. C. is not prohibit-
ive, and that so far from saying that a declaration before a notary, or
in the registry of birth or baptism, shall be the only proof permitted,
the Code expressly permits other modes of proof, both of paternal and
maternal descent, without any restriction as to the purpose for which
it may be allowed. 6 An. 158. As to white children, we conclude that
the interpretation of article 221, made in Lange et al. v. Richoux et al.,
is correct. See also Jones v. Hunter, 6 Rob. 236, where it is held that
an acknowledgment in a will made in Mississippi, not passed before
a notary, was valid.

III. The evidence in the record leaves no doubt that E. C. Hart and
Cornelia Hart openly, publicly and continuously, during many years,
acknowledged their children. It is proved that Cornelia Hart was the
concubine of E. C. Hart, and resided with him in his house from 185
until his death in 1869; that he publicly recognized them and treated
them as his children, providing for their wants and education; that he
requested a priest to baptize them, and asked a friend to stand as the
godfather of his children. It is further proved that he was solicitous
about disposing of his property so that it might enure to the benefit of
his children after his death; that he requested Father Pierre, a Catho-
lic priest, to take it for their benefit, who declined, but suggested that
he could legitimate his children by marriage, and thereupon he mar-
ried the mother of his children for the purpose of legitimating them,

in order that they might inherit his property. This is the substance of the testimony of the priest. It is ample to establish the acknowledgment before the marriage. But there is abundant proof of their acknowledgment before the marriage besides the testimony of the priest.

It is contended that inasmuch as the law forbade the marriage between their parents at the time of their birth, the children never afterwards could be legitimated. This is manifestly a *non sequitur*. While that prohibition existed as a law of the State they could not be legitimated; but the moment after the law forbidding marriages between white and colored persons was abrogated, it was lawful to legitimate them in every way that white children might be. And the only prohibition against the legitimation of children by the marriage of their parents is to be found in article 217 of the Code of 1825, and the prohibition applies only to children born " from an incestuous or adulterous connection."

It is therefore ordered and adjudged that the decree heretofore rendered in this case be adhered to.

---

MORGAN, J., *dissenting*. From the year 1854 to the day of his death, which occurred in 1869, E. C. Hart lived in concubinage with the plaintiff in this suit. She was a colored woman, and his slave. By her he had several children. In November 1867, he married her. None of the children were born after the marriage. They were, I believe, all born while the mother was a slave. Subsequent to their marriage the children were baptized. They were baptised as the children of Hart. The testimony is conclusive that before and after the marriage Hart treated these children as his own; that he admitted them to be his; that he desired to legitimate them, and that the priest who performed the marriage ceremony between the plaintiff and himself, advised him that marriage would legitimate them.

Under this state of facts the first question to be disposed of, in my opinion, is, can children born from parents so situated be legitimated under the laws of Louisiana? I think not.

Article 217 of the Civil Code of 1825 declares that " children born out of marriage, except those who are born from an incestuous or adulterous connection, may be legitimated by the subsequent marriage of their father and mother, whenever the latter have legally acknowledged them for their children, either before their marriage or by the contract of marriage itself. Every other mode of legitimating children is abolished." By the statute of twenty-fourth March, 1831, p. 86, so much of this article as abolished all other modes of legitimation,

except by marriage, was repealed, and natural fathers and mothers were permitted to legitimate their natural children, by acts declaratory of their intention, made before a notary and two witnesses. It was, however, provided in the same act that nothing contained therein should be so construed as to enable a white parent to legitimate a colored child, nor to prevent a free person of color to legitimate his colored children. It was also provided that legitimation could only take place if the natural children were the issue of parents who might, at the time their children were conceived, have contracted marriage. By the same Code free persons, without reference to color, and slaves, and free white persons and free people of color, were incapable of contracting marriage together. C. C. 95. This was the law when Hart's children by the plaintiff were conceived, when he married her, and when he died. As they are the issue of parents who, at the time they were conceived, could not have contracted marriage, they can not, in my opinion, be legitimated.

It is held by the majority of the court that what is known as the Civil Rights bill obliterates all State laws creating distinctions between inhabitants of the State on account of race, color or previous condition, and therefore the marriage between Hart and the plaintiff was not prohibited by the State laws at the time of their marriage, and the marriage legitimates the children under the acknowledgments to be found in the record. I do not so read that law. I understand it to give to all citizens of the United States of every race and color without regard to any previous condition of slavery the right to make and enforce contracts, to sue, be parties, and give evidence, to inherit, etc., and to full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

Marriage is, with us, a civil contract, inheritance is regulated by law. White persons and persons of color may by this act contract marriage; colored children may inherit. This proposition I do not dispute. But I deny that the act in question professes to regulate the legitimation of children, or that it provides how the fact of legitimation shall be established, or what acts constitute legitimation, or that it pretends to alter our laws upon the subject of inheritance. It simply does away with all distinctions on account of race, color or previous condition. The question of race or color does not in my opinion occur in the case. I treat the plaintiff and her children precisely as if they were white and free born. But I say that they are governed by the same laws that white persons are; and I say that as the law prohibited her marriage with Hart at the time their children were conceived, and as the law in existence when they were conceived declared that no child could be legitimated who was conceived when its parents could

not contract marriage, the children of Hart and the plaintiff could not be legitimated.

The Civil Code declares between whom marriage is permitted, and between whom it is prohibited. It also declares what children shall and what children shall not be legitimate, and what children born out of wedlock may, and what children may not, be legitimated. These are questions which belong exclusively to our domestic life, with which Congress, in my opinion, did not seek to interfere when it passed the Civil Rights bill. It endeavored to, and it did, put every citizen upon a common footing as regards his civil rights, but it in no manner, that I can see, changed or attempted to change the laws of Louisiana with regard to the legitimation of children born of her citizens.

By our laws marriage between uncle and niece is prohibited. But this law might be repealed. Suppose that, with the law as it stands, an uncle has a child by his niece, and after the birth of the child the law prohibiting marriage between uncle and niece is repealed, and the father and mother of the child marry, acknowledging it in the act of marriage, is the child legitimated? I think not. By the amendment to the Code above recited (217) children conceived by a woman between whom and the father marriage was prohibited were placed in the same category with children born of an incestuous or adulterous connection. A child conceived in adultery is adulterous, although at its birth its parents were free to marry. Marriage with acknowledgment does not legitimate the child so conceived. See Sirey, Codes Annotés, art. 331, p. 169.

Admitting, however, that plaintiff's children could have been legitimated, a second question then arises. It is this: Have they been properly acknowledged? Acknowledgment, as I understand the law to legitimate a child, must be made in the form and manner prescribed by law, else it has no effect, just as certain formalities are required in the making of valid testaments, donations, etc.

Assume that Hart and the plaintiff were both white, and that when her children were conceived there was no impediment to her marriage with Hart, how, and how alone, could they have been legitimated? I think the question is answered by the terms of the law. They must have been legally acknowledged as their children, either before their marriage or by the contract of marriage itself. It is not pretended that the act of marriage contains the acknowledgment; and the act of twenty-fourth March, 1831, page 86, gives to natural fathers or mothers the power to legitimate their natural children by acts declaratory of their intention, made before a notary and two witnesses. There is no such act as this in the record. In my opinion, if the parties in interest in this case were whites, the article 217 of the Code and the act of

twenty-fourth March, 1831, would prohibit their legitimation except under the forms therein prescribed.

The article 217 of the Code of 1825 is a reprint of the article 331 of the Code Napoleon, and the views which I have here expressed are sustained by Toulier, vol. 2, p. 132; by Marcadé, vol. 2, p. 43; by Demolombe, vol. 5, p. 339, No. 362; by Duranton, vol. 3, p. 174; by the Court of Cassation, Rep. Gen'l, supplément, vol. 2, p. 337, *verbo* Legitimation; by the decision of Judge Martin in the case of Pigeau *v.* Duvernay, 4 Martin, 263.

The majority of the court seem to find authority for a contrary doctrine in the dissenting opinion of Mr. Justice Rost in the case of Dupré *v.* Caruthers, 6 An. p. 156. I have examined that case, and judge Rost's opinion with all the care which I can bestow upon it, and with all the attention which his acknowledged abilities command; I can not find in it any expression even which would, in my opinion, justify the conclusion that he thought children born out of wedlock could be legitimated in any other manner than those prescribed in article 217 of the Code of 1825, and the act of twenty-fourth March, 1831. The question was not before him. What he had to pass upon was not legitimation as the result of acknowledgment or marriage. The question was whether natural children could take by inheritance the property of a deceased parent if they had not been duly acknowledged, and it arose under arts. 913, 916 of the Code. In my opinion, the vice of the opinion of the majority of the court consists in this, that the article relied on by them to support their conclusions is found under the second section of the third chapter of the Code, and relates to the acknowledgment of illegitimate children; while the subject of legitimation is treated of in the first section of the same chapter. There is, I think, a wide distinction between legitimation and the acknowledgment of an illegitimate child. The laws which regulates their respective rights and duties are different. Every legitimate or legitimated child is an acknowledged child, but every acknowledged illegitimate child is not a legitimated child, for "illegitimate children, though duly acknowledged, can not claim the rights of legitimate children." This is the language of the 224th article of the Code which follows, in the same section, the article 221 relied on.

This case is of great importance, not so much on account of the interests involved, which are large, as on account of the principle which it settles. It has been twice before the court, and most ably argued, orally and by brief, by the counsel engaged on either side. It has been patiently and maturely considered by the court, and the result of our deliberations are now and finally given to the world. It is with regret that I find myself constrained to differ from my brothers. But

the law and the authorities, as I read them, are plain before me, and I have nothing to choose from. I must go in the face of them all to agree with them, and this my duty forbids.

I know it seems hard that collateral kindred should be permitted to inherit in preference to the children of his body, no matter how begotten, and that such children should suffer from the result of a sin of which they were innocent, and which they could not prevent. But the law has put its ban upon them, white and black, and I have not the power to remove it. Hart knew when he was begetting these children what the consequences would be to them. If they suffer, it is from his fault, and not the laws, civil and moral, which he defied· Upon this subject I agree to what was said by Judge Preston in the case of Dupré:

"We know the object of the Legislature is, in the first place, to honor matrimony, which is of such incalculable importance to society; and, in the next place, to discourage concubinage, which is the cause of so much dissoluteness and evil. To prevent it the Legislature hold out the strongest motive which can influence a parent—the legal disinherison of his offspring, unless he avows his shame before a notary public and witnesses, or in the face of the church. It is true," continues this judge, "that legislation has ever failed in its object, for probably no one was ever deterred from concubinage by the consideration that his innocent offspring would be the victim of his guilt. And the only effect has been that the guilty parents have eaten the grapes, while the innocent children's teeth, with tears in their eyes, have been set on edge. But still it is the law, and must be obeyed until it is repealed."

I therefore dissent from the opinion expressed by the majority of the court.

———

WYLY, J., *dissenting.* I dissent in these cases, and reserve the right to file my reasons hereafter.